**IN THE UNITED STATES DISTRICT COURT** RECEIVED
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

2016 JUL -8  P 4: 02

| | |
|---|---|
| **NELLIE RUTH GUNN, individually** ) | DEBRA P. HACKETT, CLK |
| **and as Administratrix of the Estate** ) | U.S. DISTRICT COURT |
| **of GREGORY GUNN, Deceased,** ) | MIDDLE DISTRICT ALA |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | Case No.: 2:16-CV-557 |
| ) | |
| **CITY OF MONTGOMERY,** ) | |
| **ALABAMA; AARON CODY SMITH,** ) | **JURY TRIAL DEMANDED** |
| **individually and in his official** ) | |
| **capacity as a police officer for the** ) | |
| **City of Montgomery; and** ) | |
| **ERNEST N. FINLEY, JR.,** ) | |
| **individually and in his official** ) | |
| **Capacity as Chief of Police for the** ) | |
| **City of Montgomery,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff, Nellie Ruth Gunn, as the mother of Gregory Z. Gunn, deceased, and as

the duly-appointed administratrix of his estate, complains against the above-named

Defendants as follows:

### I.  Introduction

It was Thursday, February 25, 2016, a cold night, at around 3:20 a.m., on a

sidewalk on a public street in a residential neighborhood in Montgomery, Alabama.

Gregory Z. Gunn, a black, college-educated, fifty-eight-year old Montgomery native, was

walking home from a neighbor's home.  Mr. Gunn had been playing cards with friends at

the neighbor's house after Mr. Gunn had gotten off work at his job as a grocer, as he

often did.  Mr. Gunn was unarmed.

As he walked home, Mr. Gunn was stopped, detained, and accosted by Defendant Aaron Cody Smith, a white police officer with the City of Montgomery Police Department, who was patrolling alone. By Defendant Smith's own account, Officer Smith stopped and frisked Mr. Gunn, even though Mr. Gunn was not doing anything suspicious and Smith did not suspect Mr. Gunn of any illegal activity. Then, also by Defendant Smith's own account, Officer Smith chased Mr. Gunn; tased Mr. Gunn three (3) times; struck Mr. Gunn multiple times with an expandable metal baton; and then fired his weapon multiple times at Mr. Gunn – all simply because, according to Officer Smith, Mr. Gunn had tried to run from Smith after Smith had frisked him.

Mr. Gunn died in front of his next-door neighbor's house. When he died, Mr. Gunn was just steps away from the childhood home he shared with his mother, Plaintiff Nellie Ruth Gunn, whom he financially supported. Just before Officer Smith shot Mr. Gunn, Mr. Gunn was heard pounding on his neighbor's front door and desperately crying out his neighbor's name at the front of the home. Mr. Gunn called out for his neighbor by name at least three (3) times before Officer Smith fired seven (7) shots, of which five (5) shots struck Gunn, killing him.

Investigators from the Alabama State Bureau of Investigation (SBI) were called to investigate the "officer-involved" shooting. Over two interviews a few days apart, Officer Smith told the SBI investigators that Mr. Gunn never threatened him verbally. Smith also never indicated that Mr. Gunn had made any aggressive move to try to gain Officer Smith's firearm, Taser, or expandable metal baton; or that Mr. Gunn had even tried to make any aggressive strikes toward Smith.

2

When questioned about the stop, Officer Smith told the SBI investigators that Mr. Gunn was not "suspicious." Even under Smith's versions of the incident, the only thing Mr. Gunn did was to try repeatedly to flee or get away from Smith, after first stopping to be frisked, which Smith admitted is not against the law.

Indeed, Officer Smith admitted to the SBI investigators that at every stage of his encounter with Mr. Gunn, he did not suspect Mr. Gunn of criminal activity and had no reason to charge Mr. Gunn with a crime when Smith detained, chased, repeatedly tased, beat, and ultimately fired multiple shots at Mr. Gunn, killing him.

In short, Officer Smith detained and then frisked Mr. Gunn, both without legal justification. Smith admitted that at each stage of their encounter, Smith lacked reasonable suspicion to believe Mr. Gunn was involved in criminal activity, much less probable cause to arrest him. Yet, when Mr. Gunn allegedly exercised his right to go on his way, and without any reasonable basis for Smith to fear for his own safety or that of others, Smith initiated the use of force – by tasing him – without legal justification. And then, Smith escalated from using less-lethal force (tasing and then beating him with the expandable metal baton) through inflicting deadly force (shooting Mr. Gunn several times), causing the unarmed Mr. Gunn's sudden and violent death next door to his own home. Smith's initiation and then each escalation of the dangerous situation he created all were disproportionate to any legitimate need and legally unjustified.

This action seeks damages from those who are responsible for and whose actions and omissions proximately caused Mr. Gunn's unjustified, untimely, unnecessary, and wrongful death.

3

## II. Nature of Action, Jurisdiction, and Venue

1. This action arises out of the wrongful death of Gregory Z. Gunn, deceased, which was caused by the actions and omissions of the Defendants.

2. This action seeks to redress the deprivation under color of state law of rights, privileges, and immunities secured to the deceased Mr. Gunn and Plaintiff by the Fourth and Fourteenth Amendments to the United States Constitution, as enforced through 42 U.S.C. §1983. Plaintiff also brings this action pursuant to Code of Alabama §6-5-410 (1975) for the wrongful death of Gregory Z. Gunn, and for other damages caused by Defendants' tortious acts and omissions that may be remedied under Alabama state common law.

3. Subject matter jurisdiction over Plaintiff's claims arising under federal law exists pursuant to 28 U.S.C. §§1331 and 1343(a)(3). Supplemental jurisdiction over Plaintiff's claims arising under state law is proper pursuant to 28 U.S.C. §1367(a).

4. Defendant City of Montgomery, and upon information and belief, all individual Defendants, reside in the Middle District of Alabama, Northern Division. All acts and omissions alleged in Plaintiff's Complaint occurred in Montgomery County, Alabama, within the Northern Division of the Middle District of Alabama. Venue accordingly is proper in this district and division pursuant to 28 U.S.C. §1391(b).

5. Although the notice requirement (as to Plaintiff's state law claims) is satisfied by the filing of this Complaint, *e.g., Diemert v. City of Mobile*, 474 So.2d 663, 665-666 (Ala. 1985), *see, e.g., Patrick v. City of Florala*, 793 F.Supp. 301, 303 (M.D.Ala. 1992) (notice of claim requirement not applicable to claims under 42 U.S.C. §1983), Plaintiff has timely presented signed and sworn notification to the Defendant City of Montgomery

4

of these claims, in accordance with Code of Alabama §11-47-23 (1975). A true and correct, file-marked copy of such Notice of Claim is attached to and incorporated by reference in this Complaint as Exhibit A.

### III. Parties

6. Plaintiff, Nellie Ruth Gunn, is over the age of nineteen (19) years and a resident of Montgomery County, Alabama. She is the natural mother of Gregory Z. Gunn, deceased, and the duly-appointed administratrix of the estate of Gregory Z. Gunn, deceased. Plaintiff brings claims in her individual capacity for damages she sustained resulting from the death of her son, Gregory Z. Gunn; and also brings this action in her capacity as administratrix of the estate pursuant to 42 U.S.C. §1983 and Code of Alabama §6-5-410 (1975) for the wrongful death of Gregory Z. Gunn. A true and correct copy of the Certified Letters of Administration granted to Plaintiff by the Hon. Steven L. Reed, Probate Judge of Montgomery County, is attached to and incorporated by reference in this Complaint as Exhibit B.

7. Defendant City of Montgomery is an incorporated municipality in Montgomery County, Alabama, located within the Middle District of Alabama.

8. Defendant Aaron Cody Smith (aka A.C. Smith), upon information and belief, is a resident of Elmore County, Alabama, located within the Middle District of Alabama. He is over the age of nineteen (19) years. At all times relevant to the allegations contained in this Complaint, Defendant Smith was a police officer for the City of Montgomery. Defendant Smith is sued both individually and in his official capacity as a police officer for the City of Montgomery.

9. Defendant Ernest N. Finley, Jr., upon information and belief, is a resident of Montgomery County, Alabama, located within the Middle District of Alabama. He is over the age of nineteen (19) years. Defendant Finley has been Chief of the Montgomery Police Department since being sworn in on January 20, 2015. Defendant Finley is sued both individually and in his official capacity as Chief of Police for the City of Montgomery.

10. At all times material to this Complaint, all individual defendants were acting within the line and scope of their employment with the City of Montgomery in the Montgomery Police Department.

11. At all times material to this Complaint, all individual defendants were acting under color of state law and authority.

### IV. Facts

12. During the early morning hours of Thursday, February 25, 2016, Defendant Aaron Cody Smith was on duty as a City of Montgomery Police officer.

13. Defendant Smith, a white male, was on solo patrol duty, in uniform and driving a marked City of Montgomery police vehicle. He was patrolling in a predominantly African-American area in west Montgomery that included the predominantly African-American residential neighborhood of Mobile Heights.

14. Sometime after 3:00 a.m. on the morning of February 25, 2016, Gregory Gunn was walking from the home of a neighbor at 2944 Boone Street, near the corner of Boone Street and McElvy Street in the Mobile Heights neighborhood, to the home Mr. Gunn had shared for several years with his elderly mother, Plaintiff Nellie Ruth Gunn, at 3233 McElvy Street.

6

15.   Mr. Gunn, a black male, was a college-educated, fifty-eight-year-old native of Montgomery.  He was virtually a lifelong resident of the Mobile Heights neighborhood, and the home he was walking to that morning was the home in which he had been raised by his parents.

16.   Mr. Gunn was well-known in his community and his neighborhood.  He not only provided financial support to his mother, he also had a reputation for helping others in the community by cutting grass and doing other tasks.  Mr. Gunn's father had been one of the first African-Americans hired as a police officer by the City of Montgomery, a position in which he served for years.

17.   That evening Mr. Gunn had visited the neighbor's home at 2944 Boone Street for a social get-together of friends and acquaintances, after work, as he had in the past.

18.   Mr. Gunn had gone to the get-together late that evening, at approximately 11:00 p.m. on February 24, 2016, after his shift ended on his job as a grocer at Cash and Save in Montgomery.

19.   Sometime after 3:00 a.m. on February 25, 2016, Mr. Gunn left the social get-together at the neighbor's house on Boone Street, where Mr. Gunn and others had been playing cards, to walk home and get some sleep before going back to work that day.

20.   Mr. Gunn and a female acquaintance left the get-together for their respective homes at around the same time.

21.   The female acquaintance went in one direction, and Mr. Gunn went in another, beginning the short walk (perhaps two to three minutes, roughly 500 to 600 feet) to his home at 3233 McElvy Street.

22.   Mr. Gunn had made that walk many times, at that time of night.

7

23. Mr. Gunn was unarmed and empty-handed.

24. At around 3:20 a.m. on February 25, 2016, Mr. Gunn was walking down the sidewalk on McElvy Street toward his home when Defendant Smith drove up to Mr. Gunn in his marked City of Montgomery patrol vehicle, approaching Mr. Gunn from the front.[1]  Tr. at 20-23, 26.

25. According to Defendant Smith's own accounts to the SBI investigators, Defendant Smith pulled his marked patrol vehicle over to the side of the street on which Mr. Gunn was walking. Defendant Smith then stopped his vehicle, got out, and walked toward Mr. Gunn. Tr. at 21-22, 30-31.

26. While he was on duty, Defendant Smith was wearing a body camera as part of his uniform; and his patrol vehicle was outfitted with a dashboard camera. Tr. at 26-28.

27. The body camera had to be manually activated by the officer. Tr. at 28-29.

28. The dashboard camera would activate automatically if the vehicle's blue lights were on, or could be activated manually by the officer if the vehicle's blue lights were not on. Tr. at 26-27.

29. When Defendant Smith got out of his patrol vehicle and approached Mr. Gunn, Defendant Smith did not activate his body camera, even though he had done so for

---

[1] Following his shooting of Mr. Gunn, Defendant Smith was charged with murdering Mr. Gunn and arrested on March 2, 2016. A preliminary hearing was held in *State of Alabama v. Aaron Cody Smith* in the Montgomery County District Court on March 24, 2016. At the end of that hearing, District Judge Jimmy Pool found probable cause and ordered Defendant Smith bound over to the grand jury. All citations to "Tr." in this Complaint refer to the transcript of the testimony given at that hearing by Special Agent Jason Dinunzio of the Alabama State Bureau of Investigation. A true and correct copy of the transcript of that preliminary hearing is attached to and incorporated by reference in this Complaint as Exhibit C.

a routine traffic stop for a minor traffic violation approximately 20 to 25 minutes earlier during his shift. Tr. at 29-30.

30. When Defendant Smith got out of his patrol vehicle and approached Mr. Gunn, Defendant Smith likewise did not turn on the patrol vehicle's blue lights or manually activate the dashboard camera. Tr. at 27.

31. Because of Defendant Smith's actions, his encounter with Mr. Gunn was not recorded by either Smith's body camera or his patrol vehicle's dashboard camera. *See* Tr. at 27-29.

32. According to Smith's own accounts to the SBI investigators, upon approaching Mr. Gunn, Defendant Smith immediately directed Mr. Gunn to "take your hands out of your pockets and put your hands on the hood of the car." Tr. at 30-31.

33. Even according to Smith's own accounts to the SBI investigators, Mr. Gunn did not turn away, flee, or otherwise attempt to escape or evade Defendant Smith when Defendant Smith stopped his patrol vehicle, got out of the vehicle, and started to approach Mr. Gunn on foot. *See* Tr. at 31-33.

34. Even according to Smith's own accounts to the SBI investigators, Mr. Gunn did not turn away, flee, or otherwise attempt to escape or evade Defendant Smith when Defendant Smith directed Mr. Gunn to "take your hands out of your pockets and put your hands on the hood of the car." *See* Tr. at 31-33, 108-109.

35. Instead, according to Smith's own accounts to the SBI investigators, Mr. Gunn complied with Smith's command, by stopping, taking his hands out of his pockets, and placing his hands on the front quarter panel of Defendant Smith's patrol vehicle. Mr. Gunn also asked why Defendant Smith had stopped him. Tr. at 32-33, 101.

9

36. As Defendant Smith admitted to the SBI investigators, Defendant Smith did not feel Mr. Gunn was suspicious in any way.  *See* Tr. at 23, 32.

37. As Defendant Smith admitted to the SBI investigators, Defendant Smith also did not suspect Mr. Gunn of committing any crime.   Tr. at 22, 32, 117-118.

38. As Defendant Smith admitted to the SBI investigators, Defendant Smith did not recognize Mr. Gunn and had had no previous contact with Mr. Gunn before this encounter. Tr. at 25.

39. Although officials of the Defendant City of Montgomery claimed after the shooting that there had been an increase in burglaries in the area, Defendant Finley and other officials in the Montgomery Police Department had not increased the patrol in that neighborhood; and as noted above, upon information and belief, Defendant Smith was patrolling solo during the shift in question.

40. There had been no report of any burglary in Mr. Gunn's neighborhood that night.

41. There had been no report that Mr. Gunn had committed or was suspected of committing any burglary that was unsolved.

42. Mr. Gunn was not engaged, had not engaged, nor was he preparing to engage in any illegal activity when Defendant Smith approached, confronted, and detained Mr. Gunn.

43. Mr. Gunn had not given Defendant Smith any reason to believe that Mr. Gunn was engaged, had engaged, or was preparing to engage in any illegal activity when Defendant Smith approached, confronted, and detained Mr. Gunn. *See* Tr. at 22, 32.

10

44. Mr. Gunn was not armed when Defendant Smith approached, confronted, and detained Mr. Gunn.

45. Mr. Gunn had not given Defendant Smith any reason to believe that Mr. Gunn was armed when Defendant Smith approached, confronted, and detained Mr. Gunn. *See* Tr. at 26, 34.

46. Mr. Gunn had not given Defendant Smith any reason to believe that Mr. Gunn posed any danger to Officer Smith or to anyone else when Defendant Smith approached, confronted, and detained Mr. Gunn. *See* Tr. at 26, 32.

47. Even according to Smith's own accounts to the SBI investigators, all that Defendant Smith had seen before choosing to approach and detain Mr. Gunn was an older black man whom Smith did not know or recognize, alone, dressed in dark clothing, including a hoodie; who was doing nothing but walking on the sidewalk, at a little after 3:00 a.m., with his hands in his pockets, in a residential neighborhood (the neighborhood in which Mr. Gunn lived), in which reports of burglaries had been made in the past. Tr. at 21-25, 31-32, 98-99

48. Defendant Smith lacked articulable reasonable suspicion to detain Mr. Gunn. Tr. at 117-118.

49. Defendant Smith lacked arguable reasonable suspicion to detain Mr. Gunn.

50. Defendant Smith, a white officer, stopped and detained Mr. Gunn, a black man, because of Mr. Gunn's race.

51. In stopping and detaining Mr. Gunn, Defendant Smith acted based on an impermissible racial profile.

52. Defendant Smith did not ask Mr. Gunn his name or to identify himself when Defendant Smith approached, confronted, and detained Mr. Gunn. Tr. at 31.

53. Defendant Smith did not ask Mr. Gunn his address or where he lived – which was just a few houses down the street – when Defendant Smith approached, confronted, and detained Mr. Gunn. Tr. at 31.

54. Defendant Smith did not ask Mr. Gunn to explain his actions or what he was doing – which was walking home from a neighbor's house – when Defendant Smith approached, confronted, and detained Mr. Gunn. Tr. at 31.

55. According to Smith's own accounts to the SBI investigators, as Mr. Gunn stood still with his hands on the front quarter panel of Defendant Smith's patrol vehicle, Defendant Smith began to pat down or frisk Mr. Gunn. Tr. at 32-33.

56. Defendant Smith lacked articulable reasonable suspicion to pat down or frisk Mr. Gunn. *See* Tr. at 117-118.

57. Defendant Smith lacked arguable reasonable suspicion to pat down or frisk Mr. Gunn.

58. Defendant Smith claimed to the SBI investigators that when he saw a cell phone fall out from Mr. Gunn's clothing, Mr. Gunn then began to run away from Defendant Smith down McElvy Street, which was in the direction of Mr. Gunn's home. Tr. at 33, 35-37, 43.

59. Defendant Smith admitted to the SBI investigators that it is not illegal for an individual to flee the police on foot when the individual is not suspected of a crime. Tr. at 54, 114.

12

60. Defendant Smith admitted to the SBI investigators that when Mr. Gunn allegedly began to flee, Defendant Smith lacked grounds to suspect Mr. Gunn had committed any crime. Tr. at 36, 38.

61. Nonetheless, according to his own accounts to the SBI investigators, Defendant Smith began to chase Mr. Gunn on foot. Tr. at 35-36.

62. Defendant Smith then tased Mr. Gunn three (3) times, including twice firing the taser at Mr. Gunn, and once using the taser in drive stun mode, which required Defendant Smith to press the taser directly against Mr. Gunn's body. *See* Tr. at 36-38, 43, 45, 47-51.

63. Defendant Smith admitted to the SBI investigators that when he was tasing Mr. Gunn, Defendant Smith lacked grounds to suspect Mr. Gunn had committed any crime. Tr. at 38, 42, 46, 113.

64. Even according to Smith's accounts to the investigators, when Defendant Smith was tasing Mr. Gunn, Mr. Gunn had not threatened violence or otherwise made any threat toward Defendant Smith. Tr. at 20, 43-44, 74-75.

65. Even according to Smith's accounts to the investigators, when Defendant Smith was tasing Mr. Gunn, Mr. Gunn had not used or attempted to use any force toward Defendant Smith. *See* Tr. at 75 (Smith never indicated that Mr. Gunn ever made an aggressive move to gain Smith's firearm, taser, ASP, or anything).

66. Even according to Smith's accounts to the investigators, when Defendant Smith was tasing Mr. Gunn, Mr. Gunn had done nothing to resist Defendant Smith and had only attempted to flee. *See* Tr. at 35-38, 42-44, 113-115.

13

67. Defendant Smith claimed to the SBI investigators that Mr. Gunn got up after being tased once and continued to flee; after tasing Mr. Gunn twice more, after each of which Mr. Gunn allegedly resumed attempting to flee Defendant Smith, Defendant Smith pulled out his expandable metal baton and began striking Mr. Gunn with it. Tr. at 36-38, 42-45, 47-54, 113-115.

68. Defendant Smith admitted to the SBI investigators that he struck Mr. Gunn multiple times with the expandable metal baton. Tr. at 53.

69. When Defendant Smith was striking Mr. Gunn with the expandable metal baton, Mr. Gunn had not threatened violence or otherwise made any threat toward Defendant Smith. Tr. at 20, 74-75.

70. When Defendant Smith was striking Mr. Gunn with the expandable metal baton, Mr. Gunn had not used or attempted to use any force toward Defendant Smith. *See* Tr. at 75 (Smith never indicated that Mr. Gunn ever made an aggressive move to gain Smith's firearm, taser, ASP, or anything).

71. Defendant Smith struck Mr. Gunn several times with the expandable metal baton in front of, and on the front porch of, the house at 3237 McElvy Street – the house next door to Mr. Gunn's own home at 3233 McElvy Street. Tr. at 52-53, 56-57.

72. After striking Mr. Gunn repeatedly with the expandable metal baton, and while both men were still in front of the house at 3237 McElvy Street, Defendant Smith pulled his (Smith's) service revolver and began shooting at Mr. Gunn. Tr. at 52-53, 56-57, 61-77 (as to events immediately before shooting, two conflicting statements by Smith, both of which accounts are inconsistent with the physical evidence), 88.

14

73. Just before Mr. Gunn was shot, Mr. Gunn was heard pounding on the front door at his next-door neighbor's house at 3237 McElvy Street and desperately crying out his next-door neighbor's name at the front of the home.

74. Mr. Gunn called out for his next-door neighbor by name at least three (3) times before Defendant Smith fired seven (7) shots, five (5) of which struck Mr. Gunn, killing him.

75. Mr. Gunn died in front of his next-door neighbor's home, steps away from the childhood home Mr. Gunn shared with his elderly mother, Plaintiff, Nellie Ruth Gunn. *See* Tr. at 5-6, 8, 10-11, 13, 75, 131. Plaintiff was not allowed to go to her son as he lay dying on the ground.

76. An independent autopsy showed that Mr. Gunn was shot on his right side at a downward angle, indicating that Mr. Gunn was in a defensive, not an offensive or aggressive, posture when Defendant Smith shot him multiple times.

77. Mr. Gunn was unarmed, did not use any object as a weapon, and did not have any object to use at a weapon, at all times from the start of his attempted walk home through his being fatally shot by Defendant Smith.

78. According to Smith's accounts to the SBI investigators and radio records, when Defendant Smith first pulled up to the curb on McElvy Street to approach Mr. Gunn on February 25, Defendant Smith radioed to his police dispatcher at 3:20 a.m. that he (Smith) was getting out of his vehicle with a subject in the area. Tr. at 116-117.

79. Also according to Smith's accounts to the SBI investigators and radio records, immediately after Defendant Smith had shot Mr. Gunn, Defendant Smith again

radioed to his dispatcher at 3:22 a.m., this time advising that shots had been fired. Tr. at
117.

80. According to Smith's own statements to the SBI investigators, during that
two-minute period, Defendant Smith stopped his patrol vehicle, got out, and approached
and detained Mr. Gunn; patted down or frisked Mr. Gunn; chased Mr. Gunn from 50 to
75 yards down the street; and interspersed throughout that pursuit, tased Mr. Gunn three
(3) times, struck Mr. Gunn multiple times with an expandable metal baton, and finally
shot at Mr. Gunn seven (7) times and killed him. *See* Tr. at 21-23, 30-33, 35-38, 43, 45,
47-53, 56-57, 61-77, 88, 112-114, 131.

81. Defendant Smith lacked legal justification to use any force when he tased Mr.
Gunn, when he struck Mr. Gunn with the expandable metal baton, and when he shot Mr.
Gunn.

82. Defendant Smith lacked legal justification to use deadly force when he shot
Mr. Gunn.

## V. Causes of Action

### COUNT I
### 42 U.S.C. §1983 – Fourth Amendment
### (Illegal stop, frisk, and use of force leading to death -- Defendant Smith)

83. Plaintiffs reallege and incorporate by reference Paragraphs 1 through 82, as
though set out fully herein.

84. According to Defendant Smith's own accounts to the SBI investigators, upon
arriving on McElvy Street and seeing Mr. Gunn walking on the sidewalk, Defendant
Smith stopped his marked patrol vehicle; got out; stopped Mr. Gunn; and commanded

Mr. Gunn to place his hands on the hood of the patrol vehicle, with which Mr. Gunn complied. Tr. at 20-23, 26, 30-33, 101, 108-109.

85.  By stopping Mr. Gunn and commanding him to put his hands on top of the vehicle so Mr. Gunn could be frisked, with which Mr. Gunn complied, Defendant Smith performed an investigative stop and seized Mr. Gunn within the meaning of the Fourth Amendment to the United States Constitution.

86.  To justify an investigative stop, a law enforcement officer must be able to articulate specific objective facts that support a reasonable suspicion that the person stopped has committed or is about to commit criminal activity.

87.  Mr. Gunn's mere presence in his neighborhood, even if it were considered a high-crime area, did not constitute reasonable suspicion for Defendant Smith to detain and frisk him. *E.g., Brown v. Texas*, 443 U.S. 47, 52 (1979).

88.  Defendant Smith lacked objective facts sufficient to support a reasonable suspicion that Mr. Gunn had committed, was committing, or was about to commit criminal activity. *See* Tr. at 22, 32, 117-118.

89.  Defendant Smith's initial seizure of Mr. Gunn, by stopping Mr. Gunn and commanding him to assume a position in which Smith could frisk him or pat him down for weapons, was legally unjustified at its inception, and accordingly violated Mr. Gunn's Fourth Amendment right to be free of illegal seizures.

90.  When Defendant Smith illegally detained Mr. Gunn, Mr. Gunn was unarmed.

91.  When Defendant Smith illegally detained Mr. Gunn, Mr. Gunn had given Defendant Smith no reasonable basis on which to infer that Mr. Gunn was armed or

17

otherwise posed any danger to the safety of Defendant Smith or anyone else. *See* Tr. at 26, 34.

92. Defendant Smith lacked reasonable suspicion to frisk or pat down Mr. Gunn.

93. When Defendant Smith frisked or patted down Mr. Gunn without legal justification, and specifically without reasonable basis to believe Mr. Gunn was armed and presently dangerous, Defendant Smith violated Mr. Gunn's Fourth Amendment right to be free of illegal searches. *E.g., Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1979).

94. Because Defendant Smith lacked reasonable suspicion that Mr. Gunn was involved in criminal activity, so as to justify detaining Mr. Gunn, and further lacked reasonable suspicion that Mr. Gunn was armed, as independently required to frisk or pat down Mr. Gunn, Mr. Gunn was legally entitled to go on his way. *E.g., Florida v. Royer*, 460 U.S. 491, 497-98 (1983). And, Mr. Gunn's going on his way would not and did not supply a lawful basis to detain or to frisk him. *E.g., id.* at 498.

95. Defendant Smith admitted to the SBI investigators that it is not illegal for an individual, such as Mr. Gunn, to flee the police on foot when the individual is not suspected of a crime. Tr. at 54, 114.

96. According to Defendant Smith's own accounts to the SBI investigators, even though Defendant Smith in fact did not suspect Mr. Gunn of any criminal activity, Tr. at 22, 36, 38, and even though despite Defendant Smith lacked any reasonable suspicion to suspect Mr. Gunn of any criminal activity, Defendant Smith began to chase Mr. Gunn on foot. Tr. at 33, 35-36.

18

97. Defendant Smith chased Mr. Gunn only because, according to Smith's own accounts to the SBI investigators, Mr. Gunn attempted to get away from Defendant Smith. *See* Tr. at 35-36, 38.

98. Defendant Smith then tased Mr. Gunn three (3) times, including twice firing the taser at Mr. Gunn, and once using the taser in drive stun mode, which required Defendant Smith to press the taser directly against Mr. Gunn's body. *See* Tr. at 36-38, 43, 45, 47-51.

99. Defendant Smith tased Mr. Gunn only because Mr. Gunn attempted to get away from Defendant Smith. *See* Tr. at 35-38, 42-44, 113-115.

100. When Defendant Smith was tasing Mr. Gunn, Mr. Gunn had not used, tried to use, or threatened to use any force against Smith; or otherwise given Smith any reasonable basis to believe Mr. Gunn posed a danger to the safety of Smith or others. Tr. at 20, 43-44, 74-75.

101. According to Defendant Smith's own accounts to the SBI investigators, when Mr. Gunn tried again to get away from Smith during and after the multiple tasings, Defendant Smith continued to pursue Mr. Gunn and began to hit Mr. Gunn with Smith's expandable metal baton. Tr. at 36-38, 42-45, 47-54, 113-115.

102. Defendant Smith admitted to the SBI investigators that he struck Mr. Gunn multiple times with the expandable metal baton. Tr. at 53.

103. Defendant Smith struck Mr. Gunn with the expandable metal baton only because Mr. Gunn attempted to get away from Defendant Smith. *See* Tr. at 47-54, 113-115.

104. When Defendant Smith was striking Mr. Gunn with the expandable metal baton, Mr. Gunn had not used, tried to use, or threatened to use any force against Smith; or otherwise given Smith any reasonable basis to believe Mr. Gunn posed a danger to the safety of Smith or others. *See* Tr. at 20, 74-75.

105. After striking Mr. Gunn repeatedly with the expandable metal baton, Defendant Smith pulled his (Smith's) service revolver and began shooting at Mr. Gunn. Tr. at 52-53, 56-57, 61-77 (as to events immediately before shooting, two conflicting statements by Smith, both of which accounts are inconsistent with the physical evidence), 88.

106. When Defendant Smith was firing shots at Mr. Gunn, Mr. Gunn had not used, tried to use, or threatened to use any force against Smith; or otherwise given Smith any reasonable basis to believe Mr. Gunn posed a danger to the safety of Smith or others.

107. Defendant Smith fired seven (7) shots, *see* Tr. at 68, five (5) of which struck Mr. Gunn, killing him.

108. Any attempt by Mr. Gunn to get away from Defendant Smith did not provide legal justification for Smith to use less-lethal force of tasing or using his expandable baton to strike Mr. Gunn.

109. Any attempt by Mr. Gunn to get away from Defendant Smith did not provide legal justification for Smith to use deadly force by shooting Mr. Gunn.

110. Defendant Smith's various and multiple uses of force against Mr. Gunn -- whether tasing him, striking him with the expandable metal baton, or shooting him – all amounted to seizures within the meaning of the Fourth Amendment.

20

111. Defendant Smith lacked probable cause to arrest Mr. Gunn at any time during their encounter.

112. Defendant Smith admitted to the SBI investigators that he lacked probable cause to arrest Mr. Gunn at any time during their encounter. *See* Tr. at 22, 36, 38, 42, 46, 80-81.

113. Because Defendant Smith lacked probable cause to arrest Mr. Gunn at any time during their encounter, use of force at any level by Defendant Smith against Mr. Gunn was excessive, legally unjustified, and objectively unreasonable; and violated Mr. Gunn's right to be free of illegal seizures and use of excessive force under the Fourth Amendment.

114. Each use by Defendant Smith of less-lethal force on Mr. Gunn in tasing Mr. Gunn was excessive, legally unjustified, and objectively unreasonable; and violated Mr. Gunn's right to be free of illegal seizures and use of excessive force under the Fourth Amendment. *E.g., Graham v. O'Connor*, 490 U.S. 386, 396 (1989).

115. Each use by Defendant Smith of less-lethal force on Mr. Gunn in striking Mr. Gunn with Smith's expandable metal baton was excessive, legally unjustified, and objectively unreasonable; and violated Mr. Gunn's right to be free of illegal seizures and use of excessive force under the Fourth Amendment. *E.g., id.*

116. Each use by Defendant Smith of deadly force against Mr. Gunn by shooting Mr. Gunn with Defendant Smith's service revolver was excessive, legally unjustified, and objectively unreasonable; and violated Mr. Gunn's right to be free of illegal seizures and use of excessive force under the Fourth Amendment. *E.g., Tennessee v. Garner*, 471 U.S. 1, 12-12, 21 (1985).

117. Defendant Smith created a dangerous situation by stopping Mr. Gunn without reasonable suspicion, initiating the use of force against Mr. Gunn, and escalating the use of force against Mr. Gunn from less-lethal force to deadly force, resulting in Smith fatally shooting Mr. Gunn, all without legal justification.

118. Mr. Gunn had a fundamental interest in life under the United States Constitution.

119. Defendant Smith's actions and omissions, individually and collectively, including his initial illegal detention and frisk of Mr. Gunn without reasonable suspicion, his unjustified use of less-lethal force in tasing and then repeatedly striking Mr. Gunn, and finally his unjustified use of deadly force in shooting Mr. Gunn multiple times, proximately caused Mr. Gunn's death.

120. Defendant Smith's actions and omissions deprived Mr. Gunn of his fundamental interest in life, in violation of the United States Constitution.

121. Mr. Gunn's Fourth Amendment right not to be detained by law enforcement, except upon specific objective facts supporting a reasonable suspicion that Mr. Gunn had committed, was committing, or was about to commit criminal activity, was clearly established at the time of his fatal encounter with Defendant Smith. Indeed, that right had been clearly established for decades.

122. Mr. Gunn's Fourth Amendment right not to be frisked or patted down by law enforcement, except upon specific objective facts supporting a reasonable suspicion that Mr. Gunn was armed or otherwise presently dangerous, was clearly established at the time of his fatal encounter with Defendant Smith. Indeed, that right also had been clearly established for decades.

123. Mr. Gunn's Fourth Amendment right not to be arrested, except upon probable cause to believe he had committed a criminal offense, was clearly established at the time of his fatal encounter with Defendant Smith. Once again, that right had been clearly established for decades.

124. Mr. Gunn's Fourth Amendment right to be free of the use of excessive force or the objectively unreasonable use of deadly force was likewise clearly established at the time of his fatal encounter with Defendant Smith. Indeed, that right too had been clearly established for decades.

125. Defendant Smith lacked even arguable reasonable suspicion to support the initial investigative stop of Mr. Gunn (i.e., stopping Mr. Gunn and commanding him to place his hands on the hood of Smith's patrol vehicle).

126. Defendant Smith lacked even arguable reasonable suspicion to support Smith frisking or patting down Mr. Gunn for weapons.

127. Defendant Smith lacked even arguable probable cause to support arresting Mr. Gunn. Indeed, Defendant Smith did not attempt to arrest Mr. Gunn at any time during the fatal encounter.

128. A reasonable law enforcement officer in Defendant Smith's circumstances during his encounter with Mr. Gunn could not have believed that the use of less-lethal force, whether tasing Mr. Gunn once or multiple times, or striking Mr. Gunn with the expandable metal baton once or multiple times, was lawful under the circumstances.

129. A reasonable law enforcement officer in Defendant Smith's circumstances during his encounter with Mr. Gunn could not have believed that the use of deadly force, whether shooting Mr. Gunn once or multiple times, was lawful under the circumstances.

23

130. Defendant Smith's actions and omissions, including detaining Mr. Gunn, frisking Mr. Gunn, using less-lethal force in tasing and then repeatedly striking Mr. Gunn, and finally using deadly force in shooting Mr. Gunn multiple times and killing him, violated Mr. Gunn's clearly-established Fourth Amendment rights of which a reasonable officer would have known.

131. As a direct and proximate result of Defendant Smith's violations of Mr. Gunn's Fourth Amendment rights, Plaintiff Nellie Ruth Gunn individually has suffered severe emotional distress and mental anguish and other pain and suffering; lost regular financial support that the decedent, Gregory Gunn, had provided her; and lost the society and companionship of her son, with whom she had resumed a close family unit for multiple years before his murder, all of which suffering, injuries, and damages will in reasonable probability continue into the future and for the remainder of Plaintiff Gunn's life. *See, e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (policies underlying 42 U.S.C. §1983 in case of wrongful death require right of recovery for survivors, as well as for damages suffered by decedent); *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961) (same).

132. Defendant Smith's violations of Mr. Gunn's Fourth Amendment rights directly and proximately caused decedent Gregory Gunn to suffer (a) excruciating physical pain and suffering before his death; (b) severe emotional suffering and mental anguish, embarrassment, shame, despair, and hopelessness before his death; (c) lost earnings and/or loss of earning capacity in the future based on the probable duration of his life if the injury had not occurred; (d) loss of consortium before his death and into the future; (e) loss of the enjoyment of the remainder of the probable duration of his life if

24

the injury had not occurred; and (f) funeral and burial expenses, all of which are recoverable by Mr. Gunn's estate, through Plaintiff Nellie Ruth Gunn as the estate's duly-appointed administratrix. *E.g., Berry v. City of Muskogee*, 900 F.2d 1489, 1507 (10th Cir. 1990) (types of appropriate compensatory damages in wrongful death action under §1983); *see, e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (policies underlying 42 U.S.C. §1983 in case of wrongful death require right of recovery for survivors, as well as for damages suffered by decedent); *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961) (same); *see also Gilmere v. City of Atlanta*, 864 F.2d 734, 739 (11th Cir. 1989) (compensatory nature of damages in wrongful death action under §1983).

133.   Defendant Smith's acts and omissions were intentional, malicious, and/or involved reckless or callous indifference to decedent Gregory Gunn's federally protected rights, justifying an award of punitive damages so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct.

134.   Alternatively, Defendant Smith's acts and omissions directly and proximately caused the death of decedent Gregory Gunn, rendering Smith liable for punitive damages pursuant to Code of Alabama §6-5-410, as applied through 42 U.S.C. §1988. *See, e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (applying Georgia's wrongful death statute through §1988); *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961) (same); *but see Gilmere v. City of Atlanta*, 864 F.2d 734, 739-40 and n. 7 (11th Cir. 1989).

## COUNT II
### 42 U.S.C. §1983 – Fourth Amendment
### (Use of excessive force leading to death -- Defendant Smith)

135.  Plaintiffs reallege and incorporate by reference Paragraphs 1 through 82 and 88 through 97, as though set out fully herein.

136.  Alternatively, even assuming *arguendo* that Defendant Smith had probable cause to arrest Mr. Gunn, Defendant Smith's use of less-lethal physical force in tasing and then using his expandable metal baton to repeatedly strike Mr. Gunn, and Defendant Smith's use of deadly force in using his service revolver to repeatedly shoot Mr. Gunn, were each legally unjustified, excessive, and objectively unreason able.

137.  According to Defendant Smith's own accounts to the SBI investigators, upon arriving on McElvy Street and seeing Mr. Gunn walking on the sidewalk, Defendant Smith stopped his marked patrol vehicle; got out; stopped Mr. Gunn; and commanded Mr. Gunn to place his hands on the hood of the patrol vehicle, with which Mr. Gunn complied.  Tr. at 20-23, 26, 30-33, 101, 108-09.

138.  By stopping Mr. Gunn and commanding him to put his hands on top of the vehicle so Mr. Gunn could be frisked, with which Mr. Gunn complied, Defendant Smith performed an investigative stop and seized Mr. Gunn within the meaning of the Fourth Amendment to the United States Constitution.

139.  According to Defendant Smith's accounts to the SBI investigators, after Defendant Smith stopped Mr. Gunn and frisked him, Mr. Gunn tried to get away from Smith and run down the street -- i.e., toward Mr. Gunn's own home.  Tr. at 32-33, 35-37, 43.

26

140. Defendant Smith chased Mr. Gunn only because, according to Smith's own accounts to the SBI investigators, Mr. Gunn attempted to get away from Defendant Smith. *See* Tr. at 35-36, 38.

141. Defendant Smith then tased Mr. Gunn three (3) times, including twice firing the taser at Mr. Gunn, and once using the taser in drive stun mode, which required Defendant Smith to press the taser directly against Mr. Gunn's body. *See* Tr. at 36-38, 43, 45, 47-51.

142. Defendant Smith tased Mr. Gunn only because Mr. Gunn attempted to get away from Defendant Smith. *See* Tr. at 35-38, 42-44, 113-115.

143. When Defendant Smith was tasing Mr. Gunn, Mr. Gunn had not used, tried to use, or threatened to use any force against Smith; or otherwise given Smith any reasonable basis to believe Mr. Gunn posed a danger to the safety of Smith or others. Tr. at 20, 43-44, 74-75.

144. According to Defendant Smith's own accounts to the SBI investigators, when Mr. Gunn tried again to get away from Smith during and after the multiple tasings, Defendant Smith continued to pursue Mr. Gunn and began to hit Mr. Gunn with Smith's expandable metal baton. Tr. at 36-38, 42-45, 47-54, 113-115.

145. Defendant Smith admitted to the SBI investigators that he struck Mr. Gunn multiple times with the expandable metal baton. Tr. at 53.

146. Defendant Smith struck Mr. Gunn with the expandable metal baton only because Mr. Gunn attempted to get away from Defendant Smith. *See* Tr. at 47-54, 113-115.

27

147. When Defendant Smith was striking Mr. Gunn with the expandable metal baton, Mr. Gunn had not used, tried to use, or threatened to use any force against Smith; or otherwise given Smith any reasonable basis to believe Mr. Gunn posed a danger to the safety of Smith or others. *See* Tr. at 20, 74-75.

148. After striking Mr. Gunn repeatedly with the expandable metal baton, Defendant Smith pulled his (Smith's) service revolver and began shooting at Mr. Gunn. Tr. at 52-53, 56-57, 61-77 (as to events immediately before shooting, two conflicting statements by Smith, both of which accounts are inconsistent with the physical evidence), 88.

149. When Defendant Smith was firing shots at Mr. Gunn, Mr. Gunn had not used, tried to use, or threatened to use any force against Smith; or otherwise given Smith any reasonable basis to believe Mr. Gunn posed a danger to the safety of Smith or others.

150. Defendant Smith fired seven (7) shots, *see* Tr. at 68, five (5) of which struck Mr. Gunn, killing him.

151. Any attempt by Mr. Gunn to get away from Defendant Smith did not provide legal justification for Smith to use less-lethal force of tasing or using his expandable baton to strike Mr. Gunn.

152. Any attempt by Mr. Gunn to get away from Defendant Smith did not provide legal justification for Smith to use deadly force by shooting Mr. Gunn.

153. Defendant Smith's various and multiple uses of force against Mr. Gunn – whether tasing him, striking him with the expandable metal baton, or shooting him – all amounted to seizures within the meaning of the Fourth Amendment.

154. Defendant Smith did not attempt to arrest Mr. Gunn at any time during their encounter.

155. Defendant Smith did not advise Mr. Gunn that Mr. Gunn was under arrest at any time during their encounter.

156. Even according to Defendant Smith's own accounts to the SBI investigators, Mr. Gunn was not under arrest, nor was Defendant Smith trying to arrest Mr. Gunn, when Mr. Gunn tried to get away from Defendant Smith before Smith initiated his use of force on Mr. Gunn; or when Mr. Gunn continued to try to get away during Smith's tasing of Mr. Gunn and then Smith's striking of Mr. Gunn with Smith's expandable metal baton; or when Smith pulled his (Smith's) service revolver and began firing at Mr. Gunn. *See* Tr. at 36, 38, 42, 46, 53-54, 80-81.

157. Even according to Defendant Smith's own accounts to the SBI investigators, Mr. Gunn did not pose an immediate threat to Defendant Smith or to others, and was simply try to get away from Smith, when Smith initiated his use of force by tasing Mr. Gunn and during the time that Smith was tasing Mr. Gunn. *See* Tr. at 20, 35-38, 42-44, 74-75, 113-115.

158. Even according to Defendant Smith's own accounts to the SBI investigators, Mr. Gunn did not pose an immediate threat to Defendant Smith or to others, and was simply try to get away from Smith, when Smith began striking and continued to strike Mr. Gunn with the expandable metal baton. *See* Tr. at 20, 47-54, 74-75, 113-115.

159. Mr. Gunn did not pose an immediate threat to Defendant Smith or to others, and was simply try to get away from Smith, when Smith began firing and continued to fire at Mr. Gunn with Smith's service revolver.

160. Defendant Smith lacked probable cause to believe Mr. Gunn posed physical danger to Smith or others so as to support Smith's use of less-lethal force of tasing and striking with the expandable metal baton, or his use of deadly force, against Mr. Gunn.

161. According to his own accounts to the SBI investigators, Defendant Smith did not warn Mr. Gunn that Smith was going to shoot or otherwise warn that Smith would use deadly force before Smith repeatedly shot Mr. Gunn. *See* Tr. at 115 (in testimony of SBI Special Agent Dinunzio, the only thing Smith reported having said to Mr. Gunn, after Mr. Gunn allegedly started to flee, was "numerous times he [Smith] told Mr. Gunn to stop running and get on the ground").

162. It was feasible for Defendant Smith to have warned Mr. Gunn that Smith would shoot or otherwise use deadly force before Smith began to fire his revolver at Mr. Gunn.

163. Defendant Smith's use of less-lethal force in tasing and using his expandable metal baton to repeatedly strike Mr. Gunn was excessive, legally unjustified, and objectively unreasonable; and violated Mr. Gunn's rights to be free of unreasonable seizure and use of excessive force under the Fourth Amendment.

164. Defendant Smith's use of deadly force in repeatedly shooting Mr. Gunn was excessive, legally unjustified, and objectively unreasonable; and violated Mr. Gunn's rights to be free of unreasonable seizure and use of excessive force under the Fourth Amendment. *E.g., Tennessee v. Garner*, 471 U.S. 1, 12-12, 21 (1985); *see, e.g., Graham v. O'Connor*, 490 U.S. 386, 396 (1989).

165. Defendant Smith created a dangerous situation by stopping Mr. Gunn without reasonable suspicion, initiating the use of force against Mr. Gunn, and escalating

the use of force against Mr. Gunn from less-lethal force to deadly force, resulting in Smith fatally shooting Mr. Gunn, all without legal justification.

166. Mr. Gunn had a fundamental interest in life under the United States Constitution.

167. Defendant Smith's actions and omissions, individually and collectively, including his initial illegal detention and frisk of Mr. Gunn without reasonable suspicion, his unjustified use of less-lethal force in tasing and then repeatedly striking Mr. Gunn, and finally his unjustified use of deadly force in shooting Mr. Gunn multiple times, proximately caused Mr. Gunn's death.

168. Defendant Smith's actions and omissions deprived Mr. Gunn of his fundamental interest in life, in violation of the United States Constitution.

169. Mr. Gunn's Fourth Amendment right to be free of the use of excessive force or the objectively unreasonable use of deadly force was clearly established at the time of his fatal encounter with Defendant Smith. Indeed, that right had been clearly established for decades.

170. A reasonable law enforcement officer in Defendant Smith's circumstances during his encounter with Mr. Gunn could not have believed that the use of less-lethal force, whether tasing Mr. Gunn once or multiple times, or striking Mr. Gunn with the expandable metal baton once or multiple times, was lawful under the circumstances.

171. A reasonable law enforcement officer in Defendant Smith's circumstances during his encounter with Mr. Gunn could not have believed that the use of deadly force, whether shooting Mr. Gunn once or multiple times, was lawful under the circumstances.

31

172. Defendant Smith's actions and omissions, including detaining Mr. Gunn, frisking Mr. Gunn, using less-lethal force in tasing and then repeatedly striking Mr. Gunn, and finally using deadly force in shooting Mr. Gunn multiple times and killing him, violated Mr. Gunn's clearly-established Fourth Amendment rights of which a reasonable officer would have known.

173. As a direct and proximate result of Defendant Smith's violations of Mr. Gunn's Fourth Amendment rights, Plaintiff Nellie Ruth Gunn individually has suffered severe emotional distress and mental anguish and other pain and suffering; lost regular financial support that the decedent, Gregory Gunn, had provided her; and lost the society and companionship of her son, with whom she had resumed a close family unit for multiple years before his murder, all of which suffering, injuries, and damages will in reasonable probability continue into the future and for the remainder of Plaintiff Gunn's life. *See, e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (policies underlying 42 U.S.C. §1983 in case of wrongful death require right of recovery for survivors, as well as for damages suffered by decedent); *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961) (same).

174. Defendant Smith's violations of Mr. Gunn's Fourth Amendment rights directly and proximately caused decedent Gregory Gunn to suffer (a) excruciating physical pain and suffering before his death; (b) severe emotional suffering and mental anguish, embarrassment, shame, despair, and hopelessness before his death; (c) lost earnings and/or loss of earning capacity in the future based on the probable duration of his life if the injury had not occurred; (d) loss of consortium before his death and into the future; (e) loss of the enjoyment of the remainder of the probable duration of his life if

the injury had not occurred; and (f) funeral and burial expenses, all of which are recoverable by Mr. Gunn's estate, through Plaintiff Nellie Ruth Gunn as the estate's duly-appointed administratrix. *E.g., Berry v. City of Muskogee*, 900 F.2d 1489, 1507 (10th Cir. 1990) (types of appropriate compensatory damages in wrongful death action under §1983); *see, e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (policies underlying 42 U.S.C. §1983 in case of wrongful death require right of recovery for survivors, as well as for damages suffered by decedent); *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961) (same); *see also Gilmere v. City of Atlanta*, 864 F.2d 734, 739 (11th Cir. 1989) (compensatory nature of damages in wrongful death action under §1983).

175. Defendant Smith's acts and omissions were intentional, malicious, and/or involved reckless or callous indifference to decedent Gregory Gunn's federally protected rights, justifying an award of punitive damages so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct.

176. Alternatively, Defendant Smith's acts and omissions directly and proximately caused the death of decedent Gregory Gunn, rendering Smith liable for punitive damages pursuant to Code of Alabama §6-5-410, as applied through 42 U.S.C. §1988. *See, e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (applying Georgia's wrongful death statute through §1988); *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961) (same); *but see Gilmere v. City of Atlanta*, 864 F.2d 734, 739-40 and n. 7 (11th Cir. 1989).

**COUNT III**
**42 U.S.C. §1983 – Equal Protection – Fourteenth Amendment**
**(Racial profiling and racially-motivated use of force -- Defendant Smith)**

177. Plaintiffs reallege and incorporate by reference Paragraphs 1 through 82, 88 through 113, 117 through 120, 136, and 154 through 164, as though set out fully herein.

178. Defendant Smith told SBI investigators that he would have stopped "anyone" out at night in the Mobile Heights neighborhood in which Smith was patrolling on the night in question and in which Gregory Gunn lived. Tr. at 24.

179. Defendant Smith's advance determination to stop "anyone" who was out in the neighborhood fails to satisfy the requirement that an investigative stop be justified by objective facts supporting a "reasonable, articulable suspicion" that the particular detainee "has been, is, or is about to be engaged in criminal activity." *E.g., United States v. Place*, 462 U.S. 696, 702 (1983).

180. According to data from the 2010 census conducted by the United States Census Bureau, the racial composition of the population in the census block that included Mr. Gunn's home, and in each census block in the immediate vicinity in the Mobile Heights neighborhood, is more than 95 percent African-American (and in some of those census blocks, 100 percent African-American). *See* http://www.usa.com/AL101002400.html (as accessed May 26, 2016).

181. Data from the same census reflect that the census tract that includes Mr. Gunn's neighborhood is relatively low income, with the median income of its residents ranking 996 out of 1,174 such tracts listed in Alabama. *See* http://www.usa.com/rank/alabama-state--median-household-income--census-tract-rank.htm?hl=AL101002400&hlst=AL&yr=9000 (as accessed May 26, 2016).

182. It is a statistical near-certainty that anyone walking in Mr. Gunn's neighborhood at any time, including the early morning hours, would be African-American.

183. Defendant Smith's claimed decision that he would have stopped "anyone" he saw out in Mr. Gunn's lower-income, predominantly black neighborhood, reflected the stereotypical beliefs that "anyone" out in that neighborhood, who would almost certainly be African-American, is likely to have been engaged, to be engaged, or to be about to engage in criminal activity; and/or that any such person is armed and dangerous – in the absence of any objective facts supporting either such conclusion as to the particular person stopped.

184. Such an advance determination by Defendant Smith to stop "anyone" out in the Mobile Heights neighborhood was tantamount to a decision to stop any African-American unlucky enough to be out on the street when Defendant Smith was patrolling in the neighborhood.

185. In fact, Defendant Smith, a white, stopped Mr. Gunn, an African-American, while Mr. Gunn was simply walking home in his own neighborhood; frisked Mr. Gunn; and initiated and escalated the use of force up to and including deadly force against Mr. Gunn, all based on such racial stereotypes. Defendant Smith took each such action wholly or at least in part because of Mr. Gunn's race.

186. In taking such actions against Mr. Gunn wholly or at least in part because of Mr. Gunn's race, Defendant Smith violated Mr. Gunn's right to be free of racial discrimination under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

187. Mr. Gunn's Fourteenth Amendment right to be free from intentional discrimination because of race was clearly established at the time of his fatal encounter with Defendant Smith.

188. Defendant Smith's racially-motivated actions and omissions, including detaining Mr. Gunn, frisking Mr. Gunn, using less-lethal force in tasing and then repeatedly striking Mr. Gunn, and finally shooting Mr. Gunn multiple times and killing him, violated Mr. Gunn's clearly-established Fourteenth Amendment rights of which a reasonable officer would have known.

189. As a direct and proximate result of Defendant Smith's violations of Mr. Gunn's right to equal protection under the Fourteenth Amendment, Plaintiff Nellie Ruth Gunn individually has suffered severe emotional distress and mental anguish and other pain and suffering; lost regular financial support that the decedent, Gregory Gunn, had provided her; and lost the society and companionship of her son, with whom she had resumed a close family unit for multiple years before his murder, all of which suffering, injuries, and damages will in reasonable probability continue into the future and for the remainder of Plaintiff Gunn's life. *See, e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (policies underlying 42 U.S.C. §1983 in case of wrongful death require right of recovery for survivors, as well as for damages suffered by decedent); *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961) (same).

190. Defendant Smith's violations of Mr. Gunn's Fourteenth Amendment right to equal protection directly and proximately caused decedent Gregory Gunn to suffer (a) excruciating physical pain and suffering before his death; (b) severe emotional suffering and mental anguish, embarrassment, shame, despair, and hopelessness before his death;

(c) lost earnings and/or loss of earning capacity in the future based on the probable

duration of his life if the injury had not occurred; (d) loss of consortium before his death

and into the future; (e) loss of the enjoyment of the remainder of the probable duration of

his life if the injury had not occurred; and (f) funeral and burial expenses, all of which are

recoverable by Mr. Gunn's estate, through Plaintiff Nellie Ruth Gunn as the estate's

duly-appointed administratrix. *E.g., Berry v. City of Muskogee*, 900 F.2d 1489, 1507

(10th Cir. 1990) (types of appropriate compensatory damages in wrongful death action

under §1983); *see, e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003)

(policies underlying 42 U.S.C. §1983 in case of wrongful death require right of recovery

for survivors, as well as for damages suffered by decedent); *Brazier v. Cherry*, 293 F.2d

401, 409 (5th Cir. 1961) (same); *see also Gilmere v. City of Atlanta*, 864 F.2d 734, 739

(11th Cir. 1989) (compensatory nature of damages in wrongful death action under §1983).

191. Defendant Smith's acts and omissions were intentional, malicious, and/or

involved reckless or callous indifference to decedent Gregory Gunn's federally protected

rights, justifying an award of punitive damages so as to prevent a recurrence of such

misconduct and to deter others from engaging in similar misconduct.

192. Alternatively, Defendant Smith's acts and omissions directly and

proximately caused the death of decedent Gregory Gunn, rendering Smith liable for

punitive damages pursuant to Code of Alabama §6-5-410, as applied through 42 U.S.C.

§1988. *See, e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (applying

Georgia's wrongful death statute through §1988); *Brazier v. Cherry*, 293 F.2d 401, 409

(5th Cir. 1961) (same); *but see Gilmere v. City of Atlanta*, 864 F.2d 734, 739-40 and n. 7

(11th Cir. 1989).

## COUNT IV
### 42 U.S.C. §1983 – Supervisory and Municipal Liability – Fourth Amendment (Illegal stop, frisk, and use of force; use of excessive force – Policy, custom or practice –Defendants Finley and City of Montgomery)

193.  Plaintiffs reallege and incorporate by reference Paragraphs 1 through 82, 88 through 120, 136 through 168, and 178 through 186, as though set out fully herein.

194.  As Chief of Police, Defendant Finley has final authority and makes policy for the City of Montgomery in establishing and implementing policies and/or procedures with respect to field interviews, investigative stops, searches, frisks or pat-downs, other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), as well as the legal limits of such activities, for police officers employed by City of Montgomery.

195.  As Chief of Police, Defendant Finley has final authority and makes policy for the City of Montgomery in establishing mechanisms for reporting specific actions by City of Montgomery police officers (e.g., where an officer makes an investigative stop of a citizen or uses force against a citizen) governed by the policies and/or procedures identified in the preceding paragraph; in monitoring  both specific incidents and patterns of such incidents; in monitoring and enforcing compliance with such policies and procedures; in investigating both specific incidents and patterns of such incidents; and in imposing discipline for violations of such policies and procedures.

196.  Upon information and belief, as Chief of Police, and the final policymaker for the Defendant City of Montgomery as to these matters, Defendant Finley established and implemented policies and procedures, and/or ratified pre-existing policies and procedures, regarding field interviews, investigative stops, searches, frisks or pat-downs,

other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), for police officers employed by City of Montgomery, which policies and procedures themselves violate federal constitutional law.

197. More specifically, such policies and procedures identified in the preceding paragraph authorize City of Montgomery police officers such as Defendant Smith to exercise authority beyond the constitutional limits of such activities, in that such policies and procedures permit (whether explicitly or implicitly) and do not prohibit an officer to:

a) make an investigative stop for pretextual reasons, and without reasonable suspicion based on specific objective facts to believe the person being detained is, was, or is about to be engaged in criminal activity;

b) make an investigative stop based on an unlawful racial profile;

c) frisk or pat down a person detained without reasonable suspicion based on specific objective facts to believe that person is armed and a danger to the safety of the officer or others;

d) use less-lethal force, including tasing or striking a subject with an expandable metal baton, when it is excessive, unnecessary, and objectively unreasonable as a matter of law to do so; and

e) use deadly force on a subject when it is excessive, unnecessary, and objectively unreasonable as a matter of law to do so.

198. Acting pursuant to such policies and procedures, Defendant Smith made an investigative stop of Mr. Gunn without reasonable suspicion to believe that Mr. Gunn was involved in any criminal activity and/or based on an impermissible racial profile;

frisked Mr. Gunn without reasonable suspicion to believe Mr. Gunn was armed and a
danger to the safety of Smith or others; and used less-lethal force and then deadly force
on Mr. Gunn, both of which were excessive, unnecessary, and objectively unreasonable
as a matter of law.

199. Such policies and procedures that violated federal law, as established and/or
ratified by Defendant Finley on behalf of the Defendant City of Montgomery, were the
moving force behind, and directly and proximately caused, the violations of Mr. Gunn's
rights and his death. Such policies and procedures render liable Defendant Finley in his
individual capacity, based on his actions and establishing or ratifying those unlawful
policies and procedures; and Defendant City of Montgomery, for having official policies
and procedures that themselves violate federal law.

200. Alternatively, even if the policies and procedures of Defendants Finley and
City of Montgomery regarding field interviews, investigative stops, searches, frisks or
pat-downs, other police-citizen encounters, arrests, and the use of force by police against
citizens (including both less-lethal and deadly force), do not themselves violate federal
law, there is and was at the time of the deadly encounter between Defendant Smith and
Mr. Gunn a persistent and widespread practice among City of Montgomery police
officers of:

a) making investigative stops for pretextual reasons (e.g., to determine
whether an individual owes unpaid traffic or other fines or costs to the Defendant City),
and without reasonable suspicion based on specific objective facts to believe the person
being detained is, was, or is about to be engaged in criminal activity;

b) making investigative stops based on an unlawful racial profile;

40

c) frisking or patting down persons detained without reasonable suspicion based on specific objective facts to believe each such person is armed and a danger to the safety of the officer or others;

d) using less-lethal force, including tasing or striking a subject, when it is excessive, unnecessary, and objectively unreasonable as a matter of law to do so; and

e) using deadly force on a subject when it is excessive, unnecessary, and objectively unreasonable as a matter of law to do so,

each of which amounts to a custom or course of conduct so widespread as to become informal City policy and acquire the force of law.

201. Even if the formal policies and procedures of the Defendant City of Montgomery's police as identified in this Count are not themselves unlawful, alternatively the operation of such policies and procedures "on the street" reflects a standard operating procedure, and a widespread and persistent practice over many years, of City of Montgomery police officers violating citizens' federally protected rights in the ways identified in the preceding paragraph. This standard operating procedure, of a widespread and persistent practice of violations of citizens' rights, is shown by, e.g., citizen lawsuits charging police misconduct; citizen complaints to the Police Department, the City of Montgomery, and elected officials regarding such misconduct; and the Police Department's limited internal records of individual instances of application of these policies and procedures, such as investigative stops and incidents involving the use of force.

202. At all times material to this complaint, Defendants Finley and City of Montgomery have known or have had constructive knowledge of this widespread and

persistent practice of violations, but have refused or failed to take measures reasonably necessary to prevent or minimize such violations.

203. The response by Defendants Finley and the City of Montgomery to this widespread and persistent practice of constitutional violations has been inadequate in multiple ways. These include but are not limited to:  a) lack of or inadequate mechanism for identifying or tracking unconstitutional stops or uses of force; b) lack of or inadequate documentation of individual stops, individual uses of force, and the justification for each; c) lack of or inadequate supervisory review of documentation of individual stops or uses of force and the justification for either; d) lack of or inadequate mechanism for monitoring or tracking unconstitutional stops or uses of force; e) lack of unbiased investigation of complaints of improper stops or uses of force; f) lack of or inadequate investigation of complaints of improper stops or uses of force; g) lack of or inadequate training regarding the legal limitations on investigative stops and the permissible use of force, both less-lethal and deadly force; and h) lack of or inadequate discipline of individual officers found to have committed unlawful stops or uses of force.

204. Violations of citizens' constitutional rights of the type inflicted on Mr. Gunn, specifically including unlawful investigative stops and the use of excessive less-lethal and/or deadly force, are the known or obvious consequences either of formal City of Montgomery policies and procedures that themselves violate federal law, or of a widespread and persistent practice and custom of such violations in which Defendants Finley and the City of Montgomery have acquiesced or which they have tacitly authorized. The actions and omissions of Defendants Finley and the City of Montgomery, as identified in this Count, reflect deliberate indifference on the part of

those defendants to such known or obvious consequences of their actions and omissions, as resulted in the deprivation of Mr. Gunn's federally-protected rights.

205. Such widespread and persistent practices of violations by City of Montgomery police officers of citizens' constitutional rights, as acquiesced in by Defendants Finley and the City of Montgomery, were the moving force behind, and directly and proximately caused, the violations of Mr. Gunn's rights and his death; and render liable both Defendants Finley in his individual capacity, for the causal connection between his own deliberate indifference and Defendant Smith's violations of Mr. Gunn's rights, and City of Montgomery, based on its custom or practice of constitutional violations that proximately resulted in the violation of Mr. Gunn's rights.

206. As a direct and proximate result of the actions and omissions of Defendants Finley and the City of Montgomery causing the violation of decedent Gregory Gunn's Fourth Amendment rights, Plaintiff Nellie Ruth Gunn individually has suffered severe emotional distress and mental anguish and other pain and suffering; lost regular financial support that the decedent, Gregory Gunn, had provided her; and lost the society and companionship of her son, with whom she had resumed a close family unit for multiple years before his murder, all of which suffering, injuries, and damages will in reasonable probability continue into the future and for the remainder of Plaintiff Gunn's life. *See, e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (policies underlying 42 U.S.C. §1983 in case of wrongful death require right of recovery for survivors, as well as for damages suffered by decedent); *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961) (same).

207. The actions and omissions of Defendants Finley and the City of
Montgomery that led to the violations of Mr. Gunn's Fourth Amendment rights directly
and proximately caused decedent Gregory Gunn to suffer (a) excruciating physical pain
and suffering before his death; (b) severe emotional suffering and mental anguish,
embarrassment, shame, despair, and hopelessness before his death; (c) lost earnings
and/or loss of earning capacity in the future based on the probable duration of his life if
the injury had not occurred; (d) loss of consortium before his death and into the future;
(e) loss of the enjoyment of the remainder of the probable duration of his life if the injury
had not occurred; and (f) funeral and burial expenses, all of which are recoverable by Mr.
Gunn's estate, through Plaintiff Nellie Ruth Gunn as the estate's duly-appointed
administratrix. *E.g., Berry v. City of Muskogee*, 900 F.2d 1489, 1507 (10th Cir. 1990)
(types of appropriate compensatory damages in wrongful death action under §1983); *see,
e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (policies underlying 42
U.S.C. §1983 in case of wrongful death require right of recovery for survivors, as well as
for damages suffered by decedent); *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961)
(same); *see also Gilmere v. City of Atlanta*, 864 F.2d 734, 739 (11th Cir. 1989)
(compensatory nature of damages in wrongful death action under §1983).

208. Defendant Finley's acts and omissions were intentional, malicious, and/or
involved reckless or callous indifference to decedent Gregory Gunn's federally protected
rights, justifying an award of punitive damages against Defendant Finley individually so
as to prevent a recurrence of such misconduct and to deter others from engaging in
similar misconduct.

209. Alternatively, the actions and omissions of Defendants Finley and the City of Montgomery directly and proximately caused the death of decedent Gregory Gunn, rendering Finley and the City of Montgomery liable for punitive damages pursuant to Code of Alabama §6-5-410, as applied through 42 U.S.C. §1988. *See, e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (applying Georgia's wrongful death statute through §1988); *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961) (same); *but see Gilmere v. City of Atlanta*, 864 F.2d 734, 739-40 and n. 7 (11th Cir. 1989); *but cf. City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

## COUNT V
### 42 U.S.C. §1983 – Supervisory and Municipal Liability – Inadequate Training
### Fourth Amendment
### (Illegal stop, frisk, and use of force; use of excessive force –
### Defendants Finley and City of Montgomery)

210. Plaintiffs reallege and incorporate by reference Paragraphs 1 through 82, 88-120, 178-186, 196-197, and 200-203, as though set out fully herein.

211. As Chief of Police, Defendant Finley has final authority to train police officers employed by the City of Montgomery Police Department. And as Chief of Police, Defendant Finley has final authority and makes policy for the City of Montgomery in establishing and implementing policies and/or procedures with respect to field interviews, investigative stops, searches, frisks or pat-downs, other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), as well as the legal limits of such activities, for police officers employed by City of Montgomery.

212. Defendant Finley failed to establish proper policies and/or procedures with respect to field interviews, investigative stops, searches, frisks or pat-downs, other police-

citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), as well as the legal limits of such activities, for police officers employed by City of Montgomery.

213. Defendant Finley failed to implement proper policies and/or procedures with respect to field interviews, investigative stops, searches, frisks or pat-downs, other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), as well as the legal limits of such activities, for police officers employed by City of Montgomery.

214. Alternatively, even if Defendant Finley established or affirmed proper *formal* policies and/or procedures with respect to field interviews, investigative stops, searches, frisks or pat-downs, other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), as well as the legal limits of such activities, there are and were at the time of the deadly encounter between Defendant Smith and Mr. Gunn persistent and widespread practices "on the street" among City of Montgomery police officers of violating citizens' rights in those areas. These persistent and widespread practices amounted to informal standard operating procedures in those areas of police-citizen encounters, and created a culture among officers to approve of or at least permit such violations, of which Defendant Finley and/or other supervisory officers were aware or should have been aware, but which they chose to affirm or at least tolerate rather than halt.

215. Defendant Finley and/or other supervisory officers in the Montgomery Police Department failed to adequately train Defendant Smith as to proper policies and/or procedures with respect to field interviews, investigative stops, searches, frisks or pat-

46

downs, other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), as well as the legal limits of such activities, when Defendant Smith was hired and during Defendant Smith's employment as a police officer in the Montgomery Police Department.

216. As a direct and proximate result of the inadequate training of Defendant Smith by Defendant Finley and/or other supervisory officers in the Montgomery Police Department as to proper policies and/or procedures with respect to field interviews, investigative stops, searches, frisks or pat-downs, other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), as well as the legal limits of such activities, Defendant Smith inferably deemed it legally permissible to:

a) detain "anyone" who was out at night in Mr. Gunn's Mobile Heights neighborhood, without regard to individualized reasonable suspicion that the person detained had been, was, or was about to be engaged in criminal activity;

b) detain "anyone" who was out at night in Mr. Gunn's Mobile Heights neighborhood, based on a racial profile;

c) detain Mr. Gunn, by stopping him and demanding that he place himself in a position to be frisked (with which Smith said Mr. Gunn complied), without reasonable suspicion, based on specific objective facts, to believe Mr. Gunn had been, was, or was about to be engaged in criminal activity;

d) frisk or pat down Mr. Gunn, whether for weapons or anything else, without reasonable suspicion, based on specific objective facts, to believe Mr. Gunn was armed and posed a danger to Smith or others;

47

e) use less-lethal force on Mr. Gunn, including tasing Mr. Gunn and then striking Mr. Gunn with an expandable metal baton, even though he (Defendant Smith) did not consider Mr. Gunn "suspicious" or have reasonable suspicion that Mr. Gunn was involved in any criminal activity;

f) use less-lethal force on Mr. Gunn, including tasing Mr. Gunn and then striking Mr. Gunn with an expandable metal baton, only because (according to Smith's accounts to the SBI investigators) Mr. Gunn was trying to get away from Defendant Smith, *see* Tr. at 20, 35-38, 42-44, 47-54, 74-75, 113-115, and (as Smith told the SBI investigators) Smith allegedly wanted to handcuff Mr. Gunn and find out why Mr. Gunn was trying to get away (again, in the absence of reasonable suspicion that Mr. Gunn was involved in any criminal activity), Tr. at 41-42;

g) use less-lethal force (apparently as opposed to deadly force) on Mr. Gunn because (as Smith told the SBI investigators) Smith allegedly "was not sure if Mr. Gunn had a gun, and he [i.e., Smith] didn't want to shoot him [i.e., Mr. Gunn] in the back," Tr. at 38-39;

h) use less-lethal force on Mr. Gunn, and then apparently deadly force when less-lethal force allegedly did not produce Smith's desired result (presumably, submission), even though Defendant Smith (by his own admission to the SBI investigators) did not have probable cause to arrest Mr. Gunn, Tr. at 36, 38, 42, 46, 53-54, 80-81, and thus had no legal right to initiate using any force on Mr., Gunn whatsoever, much less escalate that use of force; and

i) use deadly force on Mr. Gunn, even though use of deadly force was excessive, unnecessary, and objectively unreasonable under the circumstances as

Defendant Smith found them, and even though a reasonable officer in those circumstances could not have found use of such force to be necessary in the situation at hand,

each of which Defendant Smith did on the night of the events giving rise to Plaintiff's complaint.

217.   Contrary to Defendant Smith's apparent beliefs, in fact each of these actions violated Mr. Gunn's federal constitutional rights.  Accordingly, the training of Defendant Smith by Defendant Finley and/or other supervisory officers in the Montgomery Police Department as to proper policies and/or procedures in these areas was inadequate in each of these particulars, among others.

218.   At all times material to this complaint, Defendants Finley and the City of Montgomery had constructive and actual notice of the inadequacies in their training of the City's police officers in these areas, and the need for rectifying these deficiencies in order to provide adequate training in these areas.

219.   First, there was a widespread and persistent pattern over many years of City of Montgomery police officers violating citizens' federally protected rights in the ways identified in paragraphs 200 and 216.  This widespread and persistent pattern of violations of citizens' rights, is shown by, e.g., citizen lawsuits charging police misconduct; citizen complaints to the Police Department, the City of Montgomery, and other elected officials, regarding such misconduct; and the Police Department's limited internal records of individual instances of application of these policies and procedures, such as investigative stops and incidents involving the use of force.

220.  Notwithstanding such notice of the deficiencies in, and the need to improve, their training of City of Montgomery police officers, Defendants Finley and City of Montgomery have refused to take measures reasonably designed to address and remedy those deficiencies in training.

221.  Furthermore, or in the alternative, at all times material to this complaint Defendants Finley and City of Montgomery have known to a great degree of certainty that City of Montgomery police officers will be (a) required frequently to make investigative stops, to frisk or pat down persons so stopped, and to arrest persons for alleged criminal activity; (b) required regularly to determine whether use of force is needed to effect an arrest or otherwise, and if so, whether to use less-lethal or instead deadly force; and (c) required on occasion to use deadly force, to protect themselves or others from serious risk of immediate physical harm.

222.  The Defendant City having armed its officers with firearms (for deadly force) and also tools of less-lethal but still significantly harmful force (e.g., taser, metal baton), there is an obvious need for Defendants Finley and City of Montgomery to train officers in the constitutional limitations of the procedures – and especially on the use of deadly and less-lethal force – used in dealing with these recurring situations.  Stated differently, even without a pattern of previous violations, such training is obviously necessary in order to avoid the constitutional violations highly likely to result if City of Montgomery police officers receive inadequate training specific to such constitutional limitations and how to apply them in particular circumstances.  *E.g., City of Canton v. Harris*, 489 U.S. 378, 390 and n. 10 (1989); *see, e.g., Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 409-10 (1997).

223. Defendants Finley and City of Montgomery provided inadequate training to City of Montgomery police officers relating to the constitutional limitations relating to investigative stops, frisking or patting down persons so stopped, arrests, the permissible use of force, and the permissible use of deadly force, in at least the particular respects in which Defendant Smith violated Mr. Gunn's federal constitutional rights as identified earlier in this Count.

224. Notwithstanding such deficiencies, and the need to remedy such deficiencies as shown by the pattern of previous similar violations, or alternatively the obvious need to remedy such deficiencies so as to avoid the high likelihood that they would result in the violation of citizens' constitutional rights (such as those of Mr. Gunn), Defendants Finley and City of Montgomery chose not to remedy such inadequacies in the training provided to Defendant Smith and other City of Montgomery police officers. Such refusal or failure by Defendants Finley and City of Montgomery amounts to deliberate indifference to the constitutional rights of Mr. Gunn and other persons with whom City of Montgomery police officers come into contact.

225. If Defendant Finley had established and implemented proper policies and/or procedures with respect to field interviews, investigative stops, searches, frisks or pat-downs, other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), as well as the legal limits of such activities, for police officers employed by Defendant City of Montgomery, and had adequately trained Defendant Smith in those procedures and the legal limits of such activities, Defendant Smith would not have unlawfully detained, frisked, and used excessive, unnecessary, and objectively unreasonable force (including both less-lethal

51

and deadly force) against Mr. Gunn and killed Mr. Gunn, in violation of Mr. Gunn's clearly-established constitutional rights.

226. The inadequate training that Defendants Finley and City of Montgomery provided to Defendant Smith was the moving force behind, and directly and proximately caused, Defendant Smith's violations of Mr. Gunn's rights and his death; and renders liable both Defendants Finley in his individual capacity, for the causal connection between his own deliberate indifference and Defendant Smith's violations of Mr. Gunn's rights, and the City of Montgomery, based on its policy, custom, or practice of inadequate training that proximately resulted in the violation of Mr. Gunn's rights.

227. As a direct and proximate result of the actions and omissions of Defendants Finley and the City of Montgomery causing the violation of decedent Gregory Gunn's Fourth Amendment rights, Plaintiff Nellie Ruth Gunn individually has suffered severe emotional distress and mental anguish and other pain and suffering; lost regular financial support that the decedent, Gregory Gunn, had provided her; and lost the society and companionship of her son, with whom she had resumed a close family unit for multiple years before his murder, all of which suffering, injuries, and damages will in reasonable probability continue into the future and for the remainder of Plaintiff Gunn's life. *See, e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (policies underlying 42 U.S.C. §1983 in case of wrongful death require right of recovery for survivors, as well as for damages suffered by decedent); *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961) (same).

228. The actions and omissions of Defendants Finley and the City of Montgomery that led to the violations of Mr. Gunn's Fourth Amendment rights directly

and proximately caused decedent Gregory Gunn to suffer (a) excruciating physical pain and suffering before his death; (b) severe emotional suffering and mental anguish, embarrassment, shame, despair, and hopelessness before his death; (c) lost earnings and/or loss of earning capacity in the future based on the probable duration of his life if the injury had not occurred; (d) loss of consortium before his death and into the future; (e) loss of the enjoyment of the remainder of the probable duration of his life if the injury had not occurred; and (f) funeral and burial expenses, all of which are recoverable by Mr. Gunn's estate, through Plaintiff Nellie Ruth Gunn as the estate's duly-appointed administratrix. *E.g., Berry v. City of Muskogee*, 900 F.2d 1489, 1507 (10th Cir. 1990) (types of appropriate compensatory damages in wrongful death action under §1983); *see, e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11th Cir. 2003) (policies underlying 42 U.S.C. §1983 in case of wrongful death require right of recovery for survivors, as well as for damages suffered by decedent); *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961) (same); *see also Gilmere v. City of Atlanta*, 864 F.2d 734, 739 (11th Cir. 1989) (compensatory nature of damages in wrongful death action under §1983).

229. Defendant Finley's acts and omissions were intentional, malicious, and/or involved reckless or callous indifference to decedent Gregory Gunn's federally protected rights, justifying an award of punitive damages against Defendant Finley individually so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct.

230. Alternatively, the actions and omissions of Defendants Finley and the City of Montgomery directly and proximately caused the death of decedent Gregory Gunn, rendering Finley and the City of Montgomery liable for punitive damages pursuant to

Code of Alabama §6-5-410, as applied through 42 U.S.C. §1988. *See, e.g., Carringer v. Rodgers*, 331 F.3d 844, 849 (11ᵗʰ Cir. 2003) (applying Georgia's wrongful death statute through §1988); *Brazier v. Cherry*, 293 F.2d 401, 409 (5ᵗʰ Cir. 1961) (same); *but see Gilmere v. City of Atlanta*, 864 F.2d 734, 739-40 and n. 7 (11ᵗʰ Cir. 1989); *but cf. City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

**COUNT VI**
**Neglect, carelessness, or unskillfulness causing wrongful death – Alabama law**
**(Illegal stop and use of force; use of excessive force -- Defendant Smith)**

231.  Plaintiffs reallege and incorporate by reference Paragraphs 1 through 82, 91, 100, 104, and 106, as though set out fully herein.

232.  Defendant Smith owed Mr. Gunn a duty of care to act as a skilled or proficient officer would act, or as a reasonably prudent law enforcement officer would act, in similar circumstances.

233.  Defendant Smith was negligent and/or failed to act toward Mr. Gunn with the level of care that a skilled or proficient officer would have exercised in similar circumstances, *e.g., City of Birmingham v. Thompson*, 404 So.2d 589, 592 (Ala. 1981) (defining "unskilled" for purposes of Code of Alabama §11-47-190 as "lacking in skill or proficiency," i.e., a response by a law enforcement officer that "would fall below that response which a skilled or proficient officer would exercise in similar circumstances"), thereby breaching the duty Smith owed to Mr. Gunn, in at least the following acts and omissions, among others:

a) Defendant Smith detained Mr. Gunn, by stopping him and demanding that he place himself in a position to be frisked (with which Smith said Mr. Gunn

54

complied), without reasonable suspicion, based on specific objective facts, to believe Mr. Gunn had been, was, or was about to be engaged in criminal activity;

b) Defendant Smith frisked or patted down Mr. Gunn without reasonable suspicion, based on specific objective facts, to believe Mr. Gunn was armed and posed a danger to Smith or others;

c) Defendant Smith used less-lethal force on Mr. Gunn, including tasing Mr. Gunn and then striking Mr. Gunn with an expandable metal baton, even though he (Defendant Smith) did not consider Mr. Gunn "suspicious" or have reasonable suspicion that Mr. Gunn was involved in any criminal activity;

d) Defendant Smith used less-lethal force on Mr. Gunn, including tasing Mr. Gunn and then striking Mr. Gunn with an expandable metal baton, only because (according to Smith's accounts to the SBI investigators) Mr. Gunn was trying to get away from Defendant Smith, *see* Tr. at 20, 35-38, 42-44, 47-54, 74-75, 113-115, and (as Smith told the SBI investigators) Smith allegedly wanted to handcuff Mr. Gunn and find out why Mr. Gunn was trying to get away (again, in the absence of reasonable suspicion that Mr. Gunn was involved in any criminal activity), Tr. at 41-42;

e) Defendant Smith used less-lethal force (apparently as opposed to deadly force) on Mr. Gunn because (as Smith told the SBI investigators) Smith allegedly "was not sure if Mr. Gunn had a gun, and he [i.e., Smith] didn't want to shoot him [i.e., Mr. Gunn] in the back," Tr. at 38-39;

f) Defendant Smith used less-lethal force on Mr. Gunn, and then apparently deadly force when less-lethal force allegedly did not produce Smith's desired result (presumably, submission), even though Defendant Smith (by his own admission to

55

the SBI investigators) did not have probable cause to arrest Mr. Gunn, Tr. at 36, 38, 42, 46, 53-54, 80-81; and thus had no legal right to initiate using any force on Mr., Gunn whatsoever, much less increase that use of force, or escalate that use of force to the use of deadly force;

    g) alternatively, even if Defendant Smith had probable cause to arrest Mr. Gunn, by his own account to the SBI investigators, Defendant Smith never told Mr. Gunn that he (Mr. Gunn) was under arrest and never tried to arrest Mr. Gunn[2], and both Defendant Smith's use of less-lethal force and his use of deadly force on Mr. Gunn were excessive, not measured or patterned for the circumstances, more force than was necessary to have effectuated an arrest, and objectively unreasonable;

    h) Defendant Smith used deadly force on Mr. Gunn, even though use of deadly force was excessive, unnecessary, not measured or patterned for the circumstances, and objectively unreasonable under the circumstances as Defendant Smith found them, and even though a reasonable or skilled or proficient officer in those circumstances could not have found use of such force to be necessary in the situation at hand, *e.g., Franklin v. City of Huntsville*, 670 So.2d 848, 852 (Ala. 1995) (reversing dismissal of illegal arrest and excessive force claims against both individual and municipal defendants); *City of Birmingham v. Thompson*, 404 So.2d 589, 592 (Ala. 1981) (affirming jury verdict and judgment against municipal defendant on excessive force claim); and

---

[2] According to Special Agent Dinunzio's testimony, the only statements Smith reported making to Mr. Gunn were commanding Mr. Gunn to take his hands out of his pockets and put them on the hood of the car, when Smith detained and frisked Mr. Gunn; and stating that "numerous times he [Smith] told Mr. Gunn to stop and get on the ground," after Mr. Gunn allegedly ran after being frisked. *See* Tr. at 30-31, 115.

i) Defendant Smith shot Mr. Gunn, not just once but multiple times, without legal justification, killing him.

234. Defendant Smith lacked even arguable reasonable suspicion, based on specific objective facts, that Mr. Gunn had been, was, or was about to be engaged in criminal activity, to justify detaining Mr. Gunn.

235. Defendant Smith lacked even arguable reasonable suspicion, based on specific objective facts, to believe Mr. Gunn was armed and posed a danger to Smith or others, to justify frisking or patting down Mr. Gunn.

236. Defendant Smith had no warrant and lacked even arguable probable cause to arrest Mr. Gunn, to justify use of even minimal force – much less tasing, beating, or shooting -- against Mr. Gunn. *E.g., Franklin v. City of Huntsville*, 670 So.2d 848, 852 (Ala. 1995) ("before any force can be used in making an arrest, probable cause must exist to make a lawful arrest"); *see, e.g., Borders v. City of Huntsville*, 875 So.2d 1168, 1179-1180 (Ala. 2003) (adopting "arguable probable cause" as standard governing peace officer immunity for alleged illegal arrest).

237. A reasonable or skilled or proficient officer in Defendant Smith's circumstances could not have believed that use of the less-lethal force of tasing Mr. Gunn, whether once or multiple times, was necessary in the situation at hand, or was measured or patterned for the circumstances. *E.g., Franklin*, 670 So.2d at 852.

238. A reasonable or skilled or proficient officer in Defendant Smith's circumstances could not have believed that use of the less-lethal force of striking Mr. Gunn with an expandable metal baton, whether once or multiple times, was necessary in

57

the situation at hand, or was measured or patterned for the circumstances. *E.g., Franklin*, 670 So.2d at 852.

239. A reasonable or skilled or proficient officer in Defendant Smith's circumstances could not have believed that use of deadly force in shooting Mr. Gunn, whether once or multiple times, was necessary in the situation at hand, or was measured or patterned for the circumstances. *E.g., Franklin*, 670 So.2d at 852.

240. In (a) detaining Mr. Gunn without even arguable reasonable suspicion to believe Mr. Gunn was involved in criminal activity, (b) frisking or patting down Mr. Gunn without even arguable reasonable suspicion to believe Mr. Gunn was armed and posed a danger to Smith or others, (c) using any degree of force on Mr. Gunn without even arguable probable cause to arrest Mr. Gunn, and (d) using deadly force (by shooting Mr. Gunn) or (e) even less-lethal force (by tasing and then striking Mr. Gunn) when a reasonable or a reasonably skilled or proficient officer in Smith's circumstances could not have believed such force was necessary in the situation at hand, was measured or patterned for the circumstances, or was objectively reasonable, among other actions, Defendant Smith acted beyond his discretionary authority or under a mistaken interpretation of the law, as such discretion is eliminated or restricted by Article I, §5 of the Constitution of Alabama of 1901, Title 15 of the Code of Alabama, and other Alabama state law.

241. In the actions listed in the preceding paragraph, among other actions, Defendant Smith acted contrary to what is required by the United States Constitution or laws, the Constitution of Alabama of 1901 (including but not limited to Article I, §5), and

other laws, rules, or regulations of Alabama enacted or promulgated for the purpose of regulating the activities of law enforcement officers in Alabama.

242.   Defendant Smith's careless and unskillful acts and omissions, for which he is not entitled to state agent or peace officer immunity, directly and proximately caused the death of decedent Gregory Gunn, rendering Smith liable for punitive damages pursuant to Code of Alabama §6-5-410.

## COUNT VII
### Neglect, carelessness, or unskillfulness causing wrongful death – Alabama law (Inadequate policies and training authorizing unlawful investigative stops, frisks, and use of force -- Defendant Finley)

243.   Plaintiffs reallege and incorporate by reference Paragraphs 1 through 82, 91, 100, 104, 106, 232-233, 236, and 242, as though set out fully herein.

244.   As Chief of Police, Defendant Finley has final authority to establish and implement policies and/or procedures with respect to field interviews, investigative stops, searches, frisks or pat-downs, other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), as well as the legal limits of such activities, for police officers employed by the Defendant City of Montgomery.

245.   As Chief of Police, Defendant Finley owed Mr. Gunn and other citizens in the City of Montgomery who may encounter Montgomery police officers a duty of care to act as a skilled or proficient Chief of Police would act, or as a reasonably prudent Chief of Police would act, in establishing such policies and/or procedures, and in providing adequate training in such policies and procedures, for Defendant Smith and other Montgomery police officers.

59

246. Upon information and belief, as Chief of Police, and the final policymaker for the Defendant City of Montgomery as to these matters, breaching his duty through his neglect or carelessness or unskillfulness, Defendant Finley established and implemented policies and procedures, and/or ratified pre-existing policies and procedures, regarding field interviews, investigative stops, searches, frisks or pat-downs, other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), for police officers employed by City of Montgomery, which policies and procedures themselves violate federal constitutional law, the Alabama constitution, Alabama statutes, and/or other Alabama law.

247. More specifically, such policies and procedures identified in the preceding paragraph authorize City of Montgomery police officers such as Defendant Smith to exercise authority beyond the legal limits of such activities, in that such policies and procedures permit (whether explicitly or implicitly) and do not prohibit an officer to:

a) make an investigative stop for pretextual reasons, and without reasonable suspicion based on specific objective facts to believe the person being detained is, was, or is about to be engaged in criminal activity;

b) make an investigative stop based on an unlawful racial profile;

c) frisk or pat down a person detained without reasonable suspicion based on specific objective facts to believe that person is armed and a danger to the safety of the officer or others;

d) use less-lethal force, including tasing or striking a subject with an expandable metal baton, when it is excessive, unnecessary, and objectively unreasonable as a matter of law to do so; and

e) use deadly force on a subject when it is excessive, unnecessary, and objectively unreasonable as a matter of law to do so.

248. Acting pursuant to such policies and procedures, Defendant Smith made an investigative stop of Mr. Gunn without reasonable suspicion to believe that Mr. Gunn was involved in any criminal activity and/or based on an impermissible racial profile; frisked Mr. Gunn without reasonable suspicion to believe Mr. Gunn was armed and a danger to the safety of Smith or others; and used less-lethal force and then deadly force on Mr. Gunn, both of which were excessive, unnecessary, and objectively unreasonable as a matter of law.

249. In establishing and implementing policies and procedures that authorize City of Montgomery police officers such as Defendant Smith to exercise authority beyond the legal limits of such activities, as described in the preceding three paragraphs, among other actions, Defendant Finley acted beyond his discretionary authority or under a mistaken interpretation of the law, as such discretion is eliminated or restricted by Article I, §5 of the Constitution of Alabama of 1901, Title 15 of the Code of Alabama, and other Alabama state law.

250. In establishing and implementing policies and procedures that authorize City of Montgomery police officers such as Defendant Smith to exercise authority beyond the legal limits of such activities, as described earlier in this Count, among other actions, Defendant Finley acted contrary to what is required by the United States Constitution or laws, the Constitution of Alabama of 1901 (including but not limited to Article I, §5), and other laws, rules, or regulations of Alabama enacted or promulgated for the purpose of regulating the activities of law enforcement officers in Alabama.

61

251.  Furthermore, or in the alternative, as Chief of Police, Defendant Finley has final authority to train police officers employed by the City of Montgomery Police Department.

252.  Breaching his duty through his neglect or carelessness or unskillfulness, Defendant Finley failed to establish proper policies and/or procedures with respect to field interviews, investigative stops, searches, frisks or pat-downs, other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), as well as the legal limits of such activities, for police officers employed by City of Montgomery.

253.  Breaching his duty through his neglect or carelessness or unskillfulness, Defendant Finley failed to implement proper policies and/or procedures with respect to field interviews, investigative stops, searches, frisks or pat-downs, other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), as well as the legal limits of such activities, for police officers employed by City of Montgomery.

254.  Breaching his duty through his neglect or carelessness or unskillfulness, Defendant Finley and/or other supervisory officers in the Montgomery Police Department failed to adequately train Defendant Smith as to proper policies and/or procedures with respect to field interviews, investigative stops, searches, frisks or pat-downs, other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), as well as the legal limits of such activities, when Defendant Smith was hired and during Defendant Smith's employment as a police officer in the Montgomery Police Department.

255. As a direct and proximate result of the inadequate training of Defendant Smith by Defendant Finley and/or other supervisory officers in the Montgomery Police Department as to proper policies and/or procedures with respect to field interviews, investigative stops, searches, frisks or pat-downs, other police-citizen encounters, arrests, and the use of force by police against citizens (including both less-lethal and deadly force), as well as the legal limits of such activities, Defendant Smith inferably deemed it legally permissible to:

a) detain "anyone" who was out at night in Mr. Gunn's Mobile Heights neighborhood, without regard to individualized reasonable suspicion that the person detained had been, was, or was about to be engaged in criminal activity;

b) detain "anyone" who was out at night in Mr. Gunn's Mobile Heights neighborhood, based on a racial profile;

c) detain Mr. Gunn, by stopping him and demanding that he place himself in a position to be frisked (with which Smith said Mr. Gunn complied), without reasonable suspicion, based on specific objective facts, to believe Mr. Gunn had been, was, or was about to be engaged in criminal activity;

d) frisk or pat down Mr. Gunn, whether for weapons or anything else, without reasonable suspicion, based on specific objective facts, to believe Mr. Gunn was armed and posed a danger to Smith or others;

e) use less-lethal force on Mr. Gunn, including tasing Mr. Gunn and then striking Mr. Gunn with an expandable metal baton, even though he (Defendant Smith) did not consider Mr. Gunn "suspicious" or have reasonable suspicion that Mr. Gunn was involved in any criminal activity;

f) use less-lethal force on Mr. Gunn, including tasing Mr. Gunn and then striking Mr. Gunn with an expandable metal baton, only because (according to Smith's accounts to the SBI investigators) Mr. Gunn was trying to get away from Defendant Smith, *see* Tr. at 20, 35-38, 42-44, 47-54, 74-75, 113-115, and (as Smith told the SBI investigators) Smith allegedly wanted to handcuff Mr. Gunn and find out why Mr. Gunn was trying to get away (again, in the absence of reasonable suspicion that Mr. Gunn was involved in any criminal activity), Tr. at 41-42;

g) use less-lethal force (apparently as opposed to deadly force) on Mr. Gunn because (as Smith told the SBI investigators) Smith allegedly "was not sure if Mr. Gunn had a gun, and he [i.e., Smith] didn't want to shoot him [i.e., Mr. Gunn] in the back," Tr. at 38-39;

h) use less-lethal force on Mr. Gunn, and then apparently deadly force when less-lethal force allegedly did not produce Smith's desired result (presumably, submission), even though Defendant Smith (by his own admission to the SBI investigators) did not have probable cause to arrest Mr. Gunn, Tr. at 36, 38, 42, 46, 53-54, 80-81, and thus had no legal right to initiate using any force on Mr. Gunn whatsoever, much less escalate that use of force; and

i) use deadly force on Mr. Gunn, even though use of deadly force was excessive, unnecessary, and objectively unreasonable under the circumstances as Defendant Smith found them, and even though a reasonable officer in those circumstances could not have found use of such force to be necessary in the situation at hand,

64

each of which Defendant Smith did on the night of the events giving rise to Plaintiff's complaint.

256. Contrary to Defendant Smith's apparent beliefs, in fact each of these actions violated Mr. Gunn's rights under the United States constitution or laws, the Alabama constitution or laws, and/or other Alabama law. Accordingly, the training of Defendant Smith by Defendant Finley and/or other supervisory officers in the Montgomery Police Department as to proper policies and/or procedures in these areas was inadequate in each of these particulars, among others.

257. Defendants Finley and City of Montgomery provided inadequate training to City of Montgomery police officers relating to the legal limitations relating to investigative stops, frisking or patting down persons so stopped, arrests, the permissible use of force, and the permissible use of deadly force, in at least the particular respects in which Defendant Smith violated Mr. Gunn's rights under United States and/or Alabama law as identified earlier in this Count.

258. In providing inadequate training that authorized (either explicitly or implicitly) City of Montgomery police officers such as Defendant Smith to exercise authority beyond the legal limits of such activities, as described in the preceding three paragraphs, among other actions, Defendant Finley acted beyond his discretionary authority or under a mistaken interpretation of the law, as such discretion is eliminated or restricted by Article I, §5 of the Constitution of Alabama of 1901, Title 15 of the Code of Alabama, and other Alabama state law.

259. In providing inadequate training that authorized (either explicitly or implicitly) City of Montgomery police officers such as Defendant Smith to exercise

authority beyond the legal limits of such activities, as described earlier in this Count, among other actions, Defendant Finley acted contrary to what is required by the United States Constitution or laws, the Constitution of Alabama of 1901 (including but not limited to Article I, §5), and other laws, rules, or regulations of Alabama enacted or promulgated for the purpose of regulating the activities of law enforcement officers in Alabama.

260. Such policies and procedures that violated federal law, the Alabama constitution, Alabama statutes, and/or other Alabama law, as established and/or ratified through the neglect, carelessness, and/or unskillfulness of Defendant Finley, for which he is not entitled to state agent or peace officer immunity, directly and proximately caused Defendant Smith's violations of Mr. Gunn's rights, including Mr. Gunn's death; thereby rendering Defendant Finley liable for punitive damages pursuant to Code of Alabama §6-5-410.

261. Furthermore, or in the alternative, the inadequate training that Defendant Smith received from Defendant Finley, through Defendant Finley's neglect, carelessness, and/or unskillfulness, for which Defendant Finley is not entitled to state agent or peace officer immunity, directly and proximately caused Defendant Smith's violations of Mr. Gunn's rights, including Mr. Gunn's death; thereby rendering Defendant Finley liable for punitive damages pursuant to Code of Alabama §6-5-410.

## COUNT VIII
## Vicarious/Respondeat Superior Liability – Wrongful death – Alabama law (Defendant City of Montgomery)

262. Plaintiffs reallege and incorporate by reference Paragraphs 1 through 82, 91, 100, 104, 106, 232 through 242, and 244 through 261, as though set out fully herein.

263. Defendant City of Montgomery is liable pursuant to Code of Alabama §11-47-190 for damages for injury done to or wrong suffered by decedent Gregory Gunn, through the neglect, carelessness, or unskillfulness of Defendants Smith and Finley, as set out in the preceding two counts against Defendants Smith and Finley, respectively.

264. With respect to the circumstances giving rise to Plaintiff's complaint, Defendant Smith acted in the line of duty and within the line and scope of his employment with the Defendant City of Montgomery in negligently, carelessly, or unskillfully conducting an investigative stop and frisk of Mr. Gunn, using less-lethal and then deadly force against Mr. Gunn, and fatally shooting Mr. Gunn; and acted in furtherance of the Defendant City of Montgomery's business in investigating or preventing possible crime, questioning potential suspects, apprehending and punishing perpetrators of crime, and protecting the public.

265. With respect to the circumstances giving rise to Plaintiff's complaint, Defendant Finley acted in the line of duty and within the line and scope of his employment with the Defendant City of Montgomery in negligently, carelessly, or unskillfully establishing, implementing, and training City of Montgomery police officers, including Defendant Smith, as to proper procedures regarding investigative stops, protective frisks or pat-downs, arrests, and use of force, and the legal limits of such activities. With respect to the circumstances giving rise to Plaintiff's complaint, Defendant Finley acted in furtherance of the Defendant City of Montgomery's business in establishing appropriate procedures regarding law enforcement activities, and training City of Montgomery police officers properly to carry out those activities in investigating

or preventing possible crime, questioning potential suspects, apprehending and punishing

perpetrators of crime, and protecting the public.

266. The negligent, careless, or unskillful acts and omissions of Defendants

Smith and Finley, acting in the line of duty, within the line and scope of their

employment with the Defendant City of Montgomery, and in furtherance of the business

of the Defendant City of Montgomery, directly and proximately caused the death of Mr.

Gunn, thereby rendering the Defendants Smith, Finley, and City of Montgomery liable

for punitive damages pursuant to Code of Alabama §§6-5-410 and 11-47-190.

## RELIEF

WHEREFORE, Plaintiff Nellie Ruth Gunn, individually and as administratrix of

the estate of Gregory Z. Gunn, deceased, demands judgment against Defendants for relief

as follows:

1) against Defendants Smith, Finley, and the City of Montgomery for

compensatory damages to Plaintiff Nellie Ruth Gunn individually, arising out of the

violations of decedent Gregory Z. Gunn's federally-protected rights, as enforced through

42 U.S.C. §1983 (Counts I through V);

2) against Defendants Smith, Finley, and the City of Montgomery for

compensatory damages to Plaintiff Nellie Ruth Gunn as administratrix of the estate of

decedent Gregory Z. Gunn, arising out of the violations of Mr. Gunn's federally-

protected rights, as enforced through 42 U.S.C. §1983 (Counts I through V);

3) against Defendants Smith, Finley, and the City of Montgomery for punitive

damages to Plaintiff Nellie Ruth Gunn as administratrix of the estate of decedent Gregory

Z. Gunn, arising out of the violations of Mr. Gunn's federally-protected rights, as enforced through 42 U.S.C. §1983 (Counts I through V);

    4) against Defendants Smith, Finley, and City of Montgomery for punitive damages to Plaintiff Nellie Ruth Gunn as administratrix of the estate of decedent Gregory Z. Gunn, for Defendants' neglect, carelessness, and/or unskillfulness that caused the wrongful death of Mr. Gunn, pursuant to Code of Alabama §6-5-410 (Counts VI through VIII);

    5) interest;

    6) costs;

    7) reasonable attorneys' fees pursuant to 42 U.S.C. §1988 (Counts I through V); and

    8) all other and further relief to which Plaintiff may justly be entitled.

Respectfully submitted,

_____
TYRONE C. MEANS  (MEA003)

_____
H. LEWIS GILLIS  (GIL011)

**OF COUNSEL:**

**MEANS GILLIS LAW, LLC**
P.O. Box 5058
60 Commerce Street, Suite 200
Montgomery, Alabama 36103-5058
Telephone:    (334) 270-1033
Facsimile:    (334) 260-9396
tcmeans@meangillislaw.com
hlgillis@meansgillislaw.com

69

MARK ENGLEHART  (ENG007)

**OF COUNSEL:**

**ENGLEHART LAW OFFICES**
9457 Alysbury Place
Montgomery, Alabama 36117-6005
Telephone:     (334) 782-5258
Facsimile:     (334) 270-8390
jmenglehart@gmail.com

> Counsel for Nellie Ruth Gunn, individually
> and as Administratrix of the Estate of
> Gregory Gunn, Deceased

## JURY DEMAND

Plaintiff demands trial by jury of all issues so triable.

_____
OF COUNSEL

## DEFENDANTS ARE TO BE PERSONALLY SERVED BY SPECIAL PROCESS SERVER AT THE FOLLOWING ADDRESSES:

City of Montgomery
c/o Brenda Gale Blalock
City Clerk
City Clerk's Office, City Hall
103 North Perry Street
Montgomery, Alabama 36104

Ernest N. Finley, Jr.
Montgomery Police Department
320 North Ripley Street
Montgomery, Alabama 36104

Aaron Cody Smith
950 Emerald Mountain Parkway
Wetumpka, Alabama 36093-3812